# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**TERRENCE MCGURK,**

**Plaintiff,**

**-vs-**                                                     **Case No.  2:05-cv-20-FtM-DNF**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

# ORDER

Plaintiff, Terrance McGurk seeks judicial review of the final decision of the Commissioner

of the Social Security Administration ("SSA") denying his claims for Disability Insurance Benefits.

The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed

by the appropriate page number), and the parties filed legal memoranda in support of their positions.

For the reasons set out herein, the decision is **AFFIRMED** pursuant to §205(g) of the Social Security

Act, 42 U.S.C. §405(g).

## I.  Social Security Act Eligibility, the ALJ Decision, and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. §§416(i), 423(d)(1)(A), 1382(a)(3)(A); 20 C.F.R. §§404.1505, 416.905.  The impairment

must be severe, making the claimant unable to do her previous work, or any other substantial gainful

activity which exists in the national economy.   42 U.S.C. §§423(d)(2), 1382(a)(3); 20 C.F.R.

-1-

§§404.1505 - 404.1511, 416.905 - 416.911.  Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

On November 29, 2000, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), asserting a disability onset date of September 29, 2000.  (Tr. p. 94-96).  Plaintiff filed a Consent to Amend Onset Date[1] on August 28, 2003, amending his onset date to September 13, 2001.  (Tr. p. 118).  His claim was denied initially on July 19, 2001, and denied upon reconsideration on October 10, 2001.  (Tr. p. 65-67,  70-72).  A hearing was held before Administrative Law Judge M. Dwight Evans ("ALJ") on August 28, 2003 and a supplemental hearing was held on November 20, 2003.  (Tr. p. 383-430).  The ALJ's decision dated April 30, 2004, denied Plaintiff's claim for benefits.  (Tr. p. 17-29).  At Step 1, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. p. 28).  At Step 2, the ALJ found Plaintiff had chronic lumbar strain, degenerative arthritis and osteoarthritis, and chronic obstructive pulmonary disorder which are impairments or combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §404.1520(b). (Tr.  p. 28).  At Step 3, the ALJ found Plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. p. 29).  At Step 4, the ALJ determined that Plaintiff's medically determinable impairments did not prevent him from performing his past relevant work.  (Tr. p. 29).  Accordingly, the ALJ found Plaintiff was not under a disability as defined in the Social Security Act at any time through the date of the decision.  (Tr. p. 29).  Plaintiff sought review by the Appeals Council, which was denied on

---

[1]  The consent to Amend Onset Date (Tr. p. 118) has the word "VOID" written on it.

November 22, 2004.  (Tr. p. 7, 13).  Plaintiff timely sought review of this decision by the United States District Court on January 18, 2005.  (Doc. 1).  The parties agree that the case is ripe for review.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standard, *Crawford v. Commissioner of Social* Security, 363 F.3d 1155, 1158 (11th Cir. 2004), *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Crawford,* 363 F.3d at 1158, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §405(g).  Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Id*. at 1158-9, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Shinn ex rel. Shinn v. Commissioner of Social Security*, 391 F.3d 1276, 1282 (11th Cir. 2004),  Crawford, 363 F.3d at 1158,  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II.  Review of Facts and Conclusions of Law

### A.  Background Facts

The first hearing was held on August 28, 2003.  Plaintiff was born on April 6, 1945, and was 58 years old on the date of the hearing. (Tr. p. 94).  He completed high school. (Tr. p.126).  His past work experience was as a line specialist, apprentice line specialist,  a truck attendant, ground worker, and boiler attendant.  (Tr. p. 121, 386-87, 401).  Plaintiff testified that he has pain every day, in his low back, and his knees stiffen. (Tr. p. 391-92).  He resigned in October 2001, but his last date of actual work was September 29, 2000. (Tr. p. 390-91, 405).  He resigned because his supervisors were requiring him to exceed his light duty work.  (Tr. p. 390-91).  For the boiler attendant, Plaintiff testified that he had to lift 40 to 60 pound bags frequently.  (Tr. p. 396-99).  However, when he filled out forms for his application for benefits, he checked the box that indicated he lifted less than 10 pounds frequently, and carried a clip board, and took readings off of gauges. (Tr. p. 135, 397-99, 400-401).  Plaintiff claims he made a mistake when completing the forms.  (Tr. p. 397).  As a ground keeper he testified he lifted 10 to 20 pounds.  (Tr. p. 401-02).   However, when he completed the forms for his application he stated that he only carried tools, "nothing heavy" and the heaviest weight he lifted was 10 pounds. (Tr. p. 134).  In a normal day, Plaintiff reads the paper, and uses the computer. (Tr. p. 405).  At the conclusion of the first hearing, the ALJ stated that the hearing and the record were closed "at this point and time."  (Tr. p. 406).

A subsequent hearing was held on November 20, 2003.  At this second hearing, the ALJ wanted to gather information that occurred since the last hearing. (Tr. p. 410).  In September 2003, Plaintiff had a vocational evaluation done for his Workers' Compensation claim. (Tr. p. 410-11).  Plaintiff testified that he was offered the position of ground worker but he was unable to do the job

due to the heavy lifting involved.  (Tr. p. 424).  A ground worker sets poles, digs trenches, and gets down in the trenches. (Tr. p. 424).  He also lays heavy pipes. (Tr. p. 424).  Plaintiff described this job as very strenuous.  (Tr. p. 424).

The ALJ presented the testimony of vocational expert Joyce Ryan. (Tr. p. 415).  Ms. Ryan had reviewed Plaintiff's past relevant work.  (Tr. p. 415).  Ms. Ryan testified that a truck attendant lifts 50 pounds, and is semiskilled work; a line specialist is a medium level of exertion and is a skilled job; an apprentice line specialist is a medium level of exertion, and is skilled work; a ground worker that lifts only 10 pounds is a light or sedentary level of exertion and semiskilled; and a boiler attendant is a light or sedentary level of exertion and is semiskilled.  (Tr. p. 415-16).  The skills learned from these jobs involve knowing the telephone industry, tools, machines, materials, and the ability to read schematics, use shop math, and use hand tools.  (Tr. p. 417).  The ALJ presented a hypothetical to Ms. Ryan.  She was to assume that an individual can lift 20 pounds occasionally, 10 pounds frequently; sit or stand or walk for six hours in a day; pushing and pulling abilities have the same limits as the lifting abilities; and has occasional postural limitations.  (Tr. p. 417).  Ms. Ryan assumed the individual was the same age as the claimant and had the same educational background.  (Tr. p. 418). The ALJ then asked if the individual could do the past relevant work of Plaintiff.  (Tr. p. 417).  Ms. Ryan testified that an individual could not perform the jobs of truck attendant, line specialist and apprentice line specialist.  (Tr. p. 417).  However, an individual could perform the jobs of ground worker and boiler attendant.  (Tr. p. 418).  The ALJ then asked if the individual was limited to sedentary work which is occasionally lifting no more than 10 pounds, would that individual be able to perform any of Plaintiff's past relevant work.  (Tr. p. 418-19).   The vocational expert found that an individual could not perform Plaintiff's past relevant work.  (Tr. p. 419).  The ALJ then asked if

an individual was limited to light work and had a moderate ability to understand and remember detailed instructions; and a moderate limitation for the following: in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; in his ability to accept instructions and respond appropriately to criticism; and, in his ability to complete a normal workday and work week without interruptions from psychologically based symptoms. (Tr. p. 419-20). Ms. Ryan testified that these limitations would impact the quality of the work to be performed, but would not preclude the individual from working. (Tr. p. 420). Counsel for Plaintiff asked if moderate was considered to be 25% to 50% of the time, then would Ms. Ryan's opinion change. (Tr. p. 422-423). Ms. Ryan testified that if moderate was considered 25% to 50% of the time, then it would be extremely difficult for an individual to maintain a job. (Tr. p. 423).

The ALJ asked counsel for Plaintiff to obtain the September 2003 functional capacity evaluation, the vocational evaluation, the transcripts, and certificate from Lee Vocational Tech, and the MRI's from Moffit Cancer Institute. (Tr. p. 425).

### B.  Medical History

From 1995 through January 2000, Plaintiff went to Patrick A. Cullen, M.D. for pain in his low back.  (Tr. p. 202-218).  In 1995, Plaintiff hurt his back coming down a pole and some pain was radiating down his legs.  (Tr. p. 216).  Dr. Cullen found that Plaintiff had some pain and stiffness, and noted that Plaintiff was very morose about everything.  (Tr. p. 216).  Dr. Cullen prescribed Voltaren and Darvocet.  (Tr. p. 214).  Dr. Cullen diagnosed Plaintiff in 1997 with degenerative osteoarthritic of the lumbar-sacral spine.  (Tr. p. 213).  Only a very small amount of degenerative osteoarthritis of the lower spine was found when Dr. Cullen compared  x-ray films from 1995 to films taken in 1997.

(Tr. p. 212).  Again in 1998, when comparing x-ray films to the prior year, Dr. Cullen found exceptionally minor degenerative changes in the lower lumbar segments.  (Tr. p. 210).

From 1995 though 2001, Plaintiff also went to John Kagan, M.D. and Allen C. Tafel, M.D. for knee pain and back pain.  (Tr. p. 219-239).  Plaintiff was involved in a motor vehicle accident in August 1994, and his knee was injured.  (Tr. p. 239).  Plaintiff complained of subpatellar pain in his right knee.  (Tr. p. 239).  Dr. Kagan diagnosed Plaintiff with chondromalacia patella on Plaintiff's right knee.  (Tr. p. 240).  Dr. Kagan injected Plaintiff's knee with Xylocaine, Depomedrol, and encouraged plaintiff to increase his activity level.  (Tr. p. 239-240).  Based upon Plaintiff's pain, on January 11, 1996, Dr. Kagan recommended that an arthroscopic evaluation and debridement be done.  (Tr. p. 238).  Plaintiff's right knee continued to cause him pain, and Dr. Kagan determined that plaintiff had a 4% impairment. (Tr. p. 236).  Dr. Kagan recommended that Plaintiff limit his squatting, deep knee bending, stair climbing, and kneeling as much as possible.  (Tr. p. 236).  In September 1998, a mass formed on Plaintiff's right knee.  (Tr. p. 235).  Plaintiff injured both of his knees in April 2000 at work.  (Tr. p. 234).  He banged his knee on a trailer hitch and then both knees gave way and he fell landing on both knees. (Tr. p. 234).  Dr. Kagan diagnosed Plaintiff with chrondromalacia post-traumatic, patellofemoral inflammation in both knees.  (Tr. p. 234).  He injected the left knee with medication.  (Tr. p. 234).  Dr. Kagan recommended that Plaintiff remain on light duty for his knee problems.  (Tr. p. 227).  In January 2001, Dr. Kagan recommended sedentary to light duty work for Plaintiff with no squatting, deep knee bending or climbing.  (Tr. p. 220).

Plaintiff visited Dr. Tafel on April 2000 with complaints of low back pain.  (Tr. p. 233).  Dr. Tafel limited him to lifting no more than 10 pounds.  (Tr. p. 233).  On June 28, 2000, Dr. Tafel recommended a lumbar epidural block for the back pain.  (Tr. p. 231).  Dr. Tafel prescribed Vioxx,

Elavil, and Ultram for the back pain.  (Tr. p. 226).  In October 2000, Dr. Tafel determined that Plaintiff should continue on pain management with medication.  (Tr. p. 222).  Dr. Tagen considered Plaintiff to have a 3% impairment rating for work-related lumbar strain.  (Tr. p. 222).  Dr. Tafel found Plaintiff's back pain to have improved on medication in January 2001, and he gave Plaintiff a 5 month supply of medication.  (Tr. p. 221)  Dr. Tafel noted that Plaintiff was depressed.  (Tr. p. 221).

On May 16, 2001, Kenneth Berdick, M.D. examined Plaintiff.  (Tr. p. 275-276).  Plaintiff was complaining of right paralumbar muscle spasm and sacroiliac pain on his right side.  (Tr. p. 275).  Plaintiff told Dr. Berdick that his pain was exacerbated by bending, lifting, prolonged standing and carrying.  (Tr. p. 275).   Plaintiff denied any joint swelling, erythema or warmth and Dr. Berdick observed that Plaintiff's grip strength, finger dexterity and gait were normal.  (Tr. p. 275).  Dr. Berdick found that Plaintiff ambulated normally without an assistive device.  (Tr. p. 275).  Plaintiff reported to Dr. Berdick that he likes to read, work on a computer, fish from a dock, and is able to drive.  (Tr. p. 275).  Dr. Berdick noted that Plaintiff was exposed to asbestosis, and has shortness of breath and exertional dyspnea but no hemoptysis.  (Tr. p. 275).  Dr. Berdick found Plaintiff to have restrictive lung disease, but he also noted that Plaintiff was not fully cooperative during testing.  (Tr. p. 276).  Dr. Berdick found Plaintiff to have lower back pain and some restriction to lumbar spine movement which was obvious during certain activities such as lifting, bending, and carrying and these activities would exacerbate his lumbar spine syndrome.  (Tr. p. 276).  Dr. Berdick found that Plaintiff functions normally under sedentary circumstances.  (Tr. p. 276).

On July 12, 2002, Douglas Savage. M.D. conducted an independent medical evaluation.  (Tr. p. 371-373).  Plaintiff complained of low back pain which radiated down his right leg to his knee.  (Tr.

-8-

p. 371).  Dr. Savage found Plaintiff to ambulate without difficulty.  (Tr. p. 372).  Dr. Savage recommended that an MRI be done of Plaintiff's lumbar spine.  (Tr. p. 372).

On May 19, 2003, a report was completed by Allan Goldman, M.D. concerning Plaintiff's asbestos exposure.  (Tr. p. 350-352).  Plaintiff's pulmonary functions studies were invalid because they were effort dependent.  (Tr. p. 350-351).  Dr. Goldman wanted to review Plaintiff's old x-rays and pulmonary function tests before making a further diagnosis.  (Tr. p. 352).

### C. Psychological History

In July 2000, Plaintiff went to Nicholas Anthony, Ph.D. for psychotherapy.  (Tr. p. 256).  Plaintiff's symptoms were a depressed mood, and his mood was sad, and his affect blunted.  (Tr. p. 256).  In addition, Plaintiff's sleep was disrupted and his energy level was low.  (Tr. p. 256).  Plaintiff's concentration was scattered.  (Tr. p. 256).  Dr. Anthony observed that Plaintiff discussed his work conflict and a demotion.  (Tr. p. 256).  Dr. Anthony recommended that Plaintiff contact a psychiatrist for medication.  (Tr. p. 256).  Dr. Anthony diagnosed Plaintiff with adjustment disorder with anxiety and depressed mood.  (Tr. p. 256).

Plaintiff contacted Frederick Schaerf, M.D., Ph.D, who conducted a psychiatric evaluation of Plaintiff on August 24, 2000 (Tr. p. 265).  Plaintiff told Dr. Schaerf that he faced a degrading situation at work and that two of his supervisors harassed him.  (Tr. p. 265).  Dr. Schaerf found Plaintiff to be negative, depressed, irritable, argumentative, angry and cranky.  (Tr. p. 266).  Plaintiff also had severe insomnia, decreased appetite and no motivation.  (Tr. p. 266).  Plaintiff had difficulty in concentration and increased confusion.  (Tr. p. 266).  Plaintiff also complained that he was in constant pain.  (Tr. p. 266).  Dr. Schaerf diagnosed Plaintiff as having a major depression, recurrent, severe, a chronic pain

disorder associated with a medical condition and psychological factors. (Tr. p. 267). Dr. Schaerf prescribed Paxil, and Klonopin. (Tr. p. 267). Dr. Schaerf also recommended that Plaintiff have some brief psychotherapy and contact Jon Newman, Ph.D. (Tr. p. 267).

On September 12, 2000, Plaintiff went to Neuropsychiatric Associates of S.W. Florida for major depression. (Tr. p. 225). He was prescribed Paxil, Klonopin, and Ultram. (Tr. p. 225) His pain level had decreased. (Tr. p. 225). Plaintiff was diagnosed with chronic pain disorder associated with a medical condition and psychological facts, and severe major depression. (Tr. p. 225). On September 13, 2000, Plaintiff saw Dr. Anthony whose plan was to return Plaintiff to full-time employment as soon as possible. (Tr. p. 255). In October 2000, Plaintiff was sleeping better, and his pain was manageable, but exacerbated with excessive activity. (Tr. p. 223). His energy level was better and his concentration had improved. (Tr. p. 253). In November 2000, Dr. Anthony noted that Plaintiff presented an even mood with an acceptable energy level. (T. p. 252). Plaintiff showed significant improvement and was responding well to the world around him. (Tr. p. 252). November 14, 2000, was Plaintiff's last therapeutic hour, and he agreed to contact Dr. Anthony only if needed. (Tr. p. 252). Plaintiff went to Dr. Robert Newman for psychological problems, however Dr. Newman's handwritten notes are difficult to decipher. (Tr. p. 268-271). On April 24, 2001, Joseph White, Ph.D. examined Plaintiff who was referred to him by the Office of Disability Determinations. (Tr. p. 272). Dr. White diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features in Axis I. (Tr. p. 273). Dr. White found that Plaintiff's "current level of depression is considered to be a barrier to his overall functioning." (Tr. p. 274).

On August 21, 2001, Plaintiff went to J. Anderson a licenced mental health counselor for an assessment. (Tr. p. 317). Ms. Anderson reported that Plaintiff presented a depressed and anxious

mood.  (Tr. p. 317).  Plaintiff told Ms. Anderson that he had disturbed sleep, anxiety with panic attacks, decreased concentration, irritability, decreased energy, SI, diminished libido, anhedonia, mood lability, and decreased STM.  (Tr. p. 317).  Ms. Anderson found Plaintiff's mood was depressed and his affect was blunted.  (Tr. p. 317).  Ms. Anderson had a treatment goal of diminishing Plaintiff's obsessive ruminations, have Plaintiff sleep 6-8 hours uninterrupted, improve his energy and motivation, and have him participate in 2 social activities per month.  (Tr. p. 318).  Plaintiff saw Ms. Anderson on August 29, 2001, September 5, 2001, and on September 13, 2001.  Plaintiff continued to be depressed and focusing on the problems with his job at FPL. (Tr. p. 314-316).  Ms. Anderson explored the possibility of Plaintiff looking into adult education classes at a local community college.  (Tr. p. 314).  On September 26, 2001, Plaintiff saw Ms. Anderson for his depressed mood.  (Tr. p. 313).  She was also concerned about his alcohol use.  (Tr. p. 313).  She reinforced that Plaintiff should look for an adult education class at the community college. (Tr. p. 313).

In February 2003, Plaintiff went to Lee Physician Group with complaints of chronic cough, and allergies.  Of note was when asked if Plaintiff had any past medical history of mental problems, the "NO" box was checked.  (Tr. p. 345).  In addition, on the System Review form, the Plaintiff checked "No" as to having any current or recent symptoms for often depressed, sleeping poorly, nervousness or anxiety, and change in moods.  (Tr. p. 346).

### D.  State Evaluations by Non-Examining Physicians

On June 11, 2001, a Psychiatric Review Technique form was completed.  (Tr. p. 283-296). The reviewer found that Plaintiff had an affective disorder of depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, and psychomotor agitation or retardation, and decreased energy, and difficulty concentrating or thinking.  (Tr. p. 286).  Plaintiff was

found to be mildly restricted as to activities of daily living, and moderately restricted as to maintaining social functioning and maintaining concentration, persistence or pace.  (Tr. p. 293).  The reviewer found one or two repeated episodes of decompensation of an extended duration.  (Tr. p. 293).

On June 11, 2001, a Mental Residual Functional Capacity Assessment was completed by Michael Dow, Ph.D.  (Tr. p. 297-300).   Dr. Dow found Plaintiff to be moderately limited in the following areas: 1) in his ability to understand and remember detailed instruction; 2) in his ability to carry out detailed instruction; 3) in his ability to maintain attention and concentration; 4) in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods; and 5) in his ability to accept instructions and respond appropriately to criticism.  (Tr. p. 297-98).  In all other areas, Dr. Dow found Plaintiff not significantly limited.  (Tr. p. 297-98).  Dr. Dow concluded that Plaintiff has physical problems and a lower concentration due to his pain medication.  (Tr. p. 299). Dr. Dow found Plaintiff was depressed due to his pain, his demotion at work, his current unemployment, and his stress.  (Tr. p. 299).  Dr. Dow concluded that Plaintiff had no marked mental limits and had the mental ability to maintain concentrated task oriented mental activity.  (Tr. p. 299).

On July 18, 2001, a Physical Residual Functional Capacity Assessment was completed by Ronald Kline, M.D.  (Tr. p. 305-312).  Dr. Kline found Plaintiff able to lift 50 pounds occasionally, and 25 pounds frequently.  (Tr. p. 306).  Plaintiff was able to sit or stand for 6 hours and was unlimited in his push and pull capabilities.   (Tr. p. 306).   Dr. Kline found no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  (Tr. p. 307-309).

A second Physical Residual Functional Capacity Assessment was completed on September 27, 2001 by Francis Klingle, M.D. (Tr. p. 320-327). Dr. Klingle found Plaintiff able to lift 20 pounds occasionally and 10 pounds frequently. (Tr. p. 321). He found Plaintiff could sit for 6 hours and could stand or walk for 6 hours. (Tr. p. 321). He was unlimited in his push or pull capabilities. (Tr. p. 321). Dr. Klingle found Plaintiff to be limited occasionally in his ability to climb, balance, stoop, kneel, crouch, and crawl based upon his problems with his knees and his chronic lumbar strain. (Tr. p. 322). Dr. Klingle found no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. p. 323-324). Dr. Klingle found Plaintiff to be credible. (Tr. p. 325).

A second Psychiatric Review Technique form was completed on October 5, 2001 by Timothy Foster, Ph.D. (Tr. p. 328-340). Dr. Foster found Plaintiff's medical disposition of his impairments not to be severe. (Tr. p. 328). He found Plaintiff to have affective disorder of depression. (Tr. p. 328, 331). Dr. Foster determined that Plaintiff was mildly limited in maintaining social functioning, but was not otherwise functionally limited. (Tr. p. 338). Dr. Foster concluded that Plaintiff is depressed from his pain, and was taking an antidepressant. (Tr. p. 340). Dr. Foster found that Plaintiff was able to take care of himself, read, use a computer, and follow directions. (Tr. p. 340). Further, Dr. Foster found that Plaintiff was a non-social person but had the social skills necessary to work. (Tr. p. 340). Dr. Foster concluded that Plaintiff had "no severe functional limits from mental." (Tr. p. 340).

### D.  Specific Issues

Plaintiff raises five issues on appeal. As stated by Plaintiff, they are: (1) There was an abuse of judicial discretion when the ALJ verbally agreed to approve the claim at the first hearing; and, then, without due process, reopened the claim; unsuccessfully and improperly sought new evidence; and,

called a second hearing that resulted in a denial of the Plaintiff's claim based on the same evidence as the first hearing; (2) the ALJ's finding that Plaintiff's mental impairment is "not severe" is not supported by substantial evidence; (3) the ALJ's finding that Plaintiff has the capacity to return to his past relevant work is not supported by substantial evidence; (4) the ALJ's RFC assessment of "light work" is not supported by substantial evidence; and (5) even without considering Plaintiff's nonexertional impairment of depression, the application of the sequential evaluation to the evidence proves that Plaintiff is not capable of performing any competitive work in the national economy and is thereby disabled pursuant to the Commissioner's rules.

### 1.  Abuse of Discretion in Holding a Second Hearing

Plaintiff argues that the ALJ erred in holding two hearings.  Plaintiff asserts that the parties reached an agreement on and off the record that if Plaintiff amended his onset date, he would be given benefits.  The Court has reviewed the referenced transcript pages, and finds that the parties discussed changing the onset date, but there is no discussion in the record concerning giving Plaintiff his benefits if he changed his onset date.  The Court has no evidence in the record of this supposed agreement, and therefore does not find this argument persuasive.

Plaintiff argues that the ALJ closed the first hearing and the record, and is not entitled to reopen the hearing or the record.  Pursuant to 20 C.F.R. §404.944, an ALJ is permitted to reopen a hearing at any time before the notice of decision is mailed to receive new and material evidence.  At the second hearing, the ALJ stated that "the primary issues that I wanted to inquire about, based upon some newly discovered references, are information since the time of the last hearing or the issues of concern at the present time prior to a Decision being written." (Tr. p. 410).  The newly discovered information related to a functional capacity evaluation that was done after the first hearing for

-14-

Plaintiff's worker's compensation claim.  (Tr. p. 410-411).  Counsel for Plaintiff made no objection at the second hearing regarding any prior agreements between Plaintiff and the ALJ nor did he object to the evidence presented at the hearing.  In addition, an ALJ has a duty to develop and full and fair record prior to his decision.  *See, Durham v. Apfel*, 34 F.Supp.2d 1373, 1381 (N.D. Ga. 1998).  The Court finds that the ALJ did not abuse his judicial discretion in making his decision and did not err in holding a second hearing regarding newly discovered evidence.

### 2.  ALJ's Finding Mental Impairment Not Severe

Plaintiff argues that the ALJ erred in not finding Plaintiff's mental impairment to be severe. Plaintiff asserts that because the ALJ cited to  psychiatric evidence in his request that Plaintiff's onset date be amended, Plaintiff's mental impairment should be considered severe.  Plaintiff cited to no law or regulations that support this proposition, and the Court does not find this argument persuasive.

Plaintiff then argues that based upon Plaintiff's medical history, the ALJ erred in not finding Plaintiff's mental impairment severe.  At Step 2, the ALJ found that Plaintiff had chronic lumbar strain, degenerative arthritis and osteoarthritis, and chronic obstructive pulmonary disorder which are considered "severe" impairments.  The ALJ noted that Plaintiff was diagnosed with depression and had complained of lack of concentration and social isolation.  (Tr. p. 26).  The ALJ noted that Plaintiff participated in activities such as driving, reading, using a computer and fishing, and all of these activities require patience and concentration.  (Tr. p. 26).  The ALJ then considered the State Agency non-examining psychologist report of October 2001 wherein the psychologist found Plaintiff's mental impairment was not severe.  The ALJ also noted that when Plaintiff listed his medications in 2003, he did not list any anti-depressant medication, his last visit to a  mental health care provider was two

years prior to the decision, and when Plaintiff went to Lee Physician Group in February 2003, he did not report any mental problems.

Plaintiff argues that in 2000, Dr. Anthony diagnosed Plaintiff with Adjustment Disorder With Mixed Anxiety and Depressed Mood. Dr. Schaerf also found in August 2000, that Plaintiff was negative, depressed, irritable, argumentative, angry and cranky. In 2001, Plaintiff argues that he was diagnosed by Dr. White with major depressive disorder, recurrent, severe without psychotic features, and Dr. White found that Plaintiff's level of depression at that time was a barrier to his overall functioning.

At Step 2 of the five-step evaluation process, the ALJ is called upon to determine whether a claimant's impairments are severe. By definition, this inquiry is a "threshold" inquiry. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). It allows only claims based on the most trivial impairments to be rejected. *Id*. In the Eleventh Circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984). A claimant has to burden to show that his impairment is not so slight and its effect not so minimal, and this burden is mild. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).

The ALJ reviewed the medical records containing Plaintiff's mental impairment. Plaintiff does have medical records that do indicate that he had depression at times. However, in October 2000, Dr. Anthony noted that Plaintiff was sleeping better, his energy level was better, and his concentration had improved. Dr. Anthony found Plaintiff showed significant improvement. Dr. Anthony's plan was to have Plaintiff be able to return to work, which does not show a severe impairment. Dr. White did find

-16-

that Plaintiff's level of depression was a barrier to overall functioning in April 2001.  However, in August and September 2001, Ms. Anderson was treating Plaintiff for his depression and at the same time recommending that he look into adult education classes.  Further, in 2003, Plaintiff did not list any history of depression, anxiety or sleep disorder when he went to Lee Physician Group for other ailments.  The Court determines that the ALJ did not err in determining that Plaintiff's mental impairment was not a "severe" impairment at Step 2 in the Sequential Evaluation.

### 3.  Return to Past Relevant Work

Plaintiff argues that the ALJ erred in determining that Plaintiff could return to his past relevant work as a boiler attendant and ground worker.  The transcript has some conflicting information concerning the requirements of Plaintiff's past relevant work.  When Plaintiff initially applied for benefits, he indicated that the jobs of boiler attendant and ground worker required lifting less than 10 pounds, which would put these jobs in the sedentary exertional level.  On the application form, he stated that the job of ground worker required him to carry tools, "nothing heavy", and that he lifted at most 10 pounds, and lifted less than 10 pounds frequently.  On the application form, he also wrote that the job of boiler attendant only required him to carry a clip board, and take readings off of gauges, and that job required him to lift less than 10 pounds occasionally, and frequently.  During the hearing, however, Plaintiff testified that he had been mistaken when he completed those forms, and he corrected the lifting requirement of a boiler attendant to 40 to 60 pounds which would put this job in the heavy exertional level.  Plaintiff testified that the job of ground worker required lifting 20 pounds or more, which would place this job in the medium exertional level.

-17-

At the hearing, the vocational expert testified that Plaintiff could not perform his past relevant work of truck attendant, line specialist and apprentice line specialist, but could perform the jobs of ground worker and boiler attendant. The vocational expert found that the job of a ground worker who only lifts 10 pounds has a light or sedentary level of exertion, and the job of boiler attendant has a light or sedentary level of exertion.

Plaintiff argues that the corresponding jobs in the <u>Dictionary of Occupational Titles</u> ("DOT") shows a powerhouse mechanic is rated as medium work or heavy work, and an assistant cable splicer as medium work which are corresponding jobs to a boiler attendant and ground worker. The Commissioner argues that the ALJ weighed the conflicting evidence and resolved the conflict. When a vocational expert's testimony conflicts with the DOT, then the vocational expert's testimony "'trumps'" the DOT because the DOT is not the sole source of admissible information concerning jobs. *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999).

In the instant case, the vocational expert testified concerning the lifting requirements for the jobs of boiler attendant and ground worker and found that Plaintiff had the residual functional capacity to perform the lifting requirements of these jobs. In addition, the Court reviewed the forms that Plaintiff completed with his application. In these forms, it is clear that Plaintiff did not simply check the wrong box concerning lifting requirements because he added additional language saying that the job of ground worker required him to carry tools, "nothing heavy" and the job of boiler attendant only required him to carry a clip board, and take readings off of gauges. The Court determines that the ALJ did not err in relying on the testimony of the vocational expert to determine that Plaintiff could return to his past relevant work of a boiler attendant or ground worker.

**4. RFC of "light work"**

Plaintiff asserts that the ALJ erred in finding that Plaintiff had the residual functional capacity to perform light work. Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite his impairments. 20 C.F.R. §4-4.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* In evaluating a claimant's residual functional capacity, the ALJ is obligated to consider all of the claimant's impairments, including subjective symptoms such as pain. The definition of light work is being able to lift no more than twenty pounds and frequently lifting of up to ten pounds. 20 C.F.R. §404.1567(b). Light work also includes a good deal of walking or standing or it may involve sitting most of the time. 20 C.F.R. §404.1567(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. 404.1567(b).

The ALJ has discretion to determine that a claimant's complaints of pain or other subjective symptoms are not credible. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). But, if the ALJ rejects a claimant's testimony, he or she must articulate reasons, based on substantial evidence, for refusing to credit a claimant's subjective pain testimony. *Wilson v. Barnhart*, 284 F.3d 1219, 1225, (11th Cir. 2002), *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991). If the ALJ fails to articulate the reasons for discrediting the subjective testimony of the plaintiff, then as a matter of law, the testimony must be accepted as true. *Wilson v. Barnhart*, 284 F.3d at 1225, citing *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Plaintiff asserts that he is unable to perform all of the requirements of light work due to his lifting restrictions. He relies on the reports of Dr. Berdick who Plaintiff claims states that he is limited

to sedentary work.[2]  Plaintiff also cites to the report of Dr. Tafel in April 2000 which restricts Plaintiff to lifting no greater than 10 pounds.  Due to Plaintiff's knee problems, Dr. Kagan recommended that he be restricted to sedentary to light work with no squatting, deep knee bending or climbing.  Dr. Cullen recommended that Plaintiff stay on light duty permanently.  Plaintiff also argues that when the doctors limited Plaintiff to light duty, they were not using the same definition as light duty found for Social Security purposes.

The ALJ reviewed in depth the reports of Dr. Cullen, Dr. Tafel, Dr. Kagan, Dr. Berdick, and Dr. Savage.  He noted the restrictions from these doctors.  He also reviewed the activities that Plaintiff reported to various doctors and other sources, including reading, watching television, doing household chores, fishing, ambulating without assistance, and driving.  The ALJ found that Plaintiff's ability to participate in these activities is not indicative of an individual who is unable to perform all work activities.  The ALJ did not find Plaintiff's subjective allegations of his limitations to be credible.  The ALJ has to discretion to determine that Plaintiff's subjective symptoms are not credible.  The ALJ clearly stated why he found Plaintiff's subjective symptoms not to be credible based upon the medical report and based upon Plaintiff's activities.

Plaintiff also argues that the ALJ relied on a non-examining physician's report as substantial evidence.  An opinion of an examining physician is generally entitled to more weight than a non-examining physician.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).  The reports of non-examining physicians do not constitute substantial evidence on which to base an administrative decision.  *Bruet v. Barnhart*, 313 F.Supp.2d 1338, 1346 (M.D. Fla. 2004), *citing, Spencer on Behalf*

---

[2]  Dr. Berdick actually reported that Plaintiff functions reasonably well under sedentary circumstances. (Tr. p. 276).

*of Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir. 1985), *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).  The ALJ considered the State Agency non-examining physician's physical functional capacity assessment done in September 2001 finding Plaintiff had the residual functional capacity to do light work, but did not give it substantial weight due to it being done by a non-examining physician.  However, the ALJ did consider it for its probative value.  An ALJ must review the opinions of the State agency medical consultants.  20 C.F.R. §404.1527(f)(2)(3).  The ALJ reached his conclusion that Plaintiff could perform light work based on the evidence in the record, and Plaintiff's allegations that he had persistent pain, depression, and functional limitations, which the ALJ did not find fully credible.   The Court determines that the ALJ did not err in determining that Plaintiff had the residual functional capacity to perform light work.

### 5.  Competitive Work in the National Economy

Plaintiff argues that his physicians limited him to sedentary work, and therefore, Plaintiff has met his burden at Step 4, and that Plaintiff should be found to be disabled under the Grids.  The Court has determined that Plaintiff has the residual functional capacity for light work and can return to his past relevant work, therefore, this argument is moot.

### III.  Conclusion

Accordingly, the ALJ's decision is consistent with the requirements of law and supported by substantial evidence.  Therefore, the decision of the Commissioner is **AFFIRMED** pursuant to

sentence four of 42 U.S.C. §405(g).  The Clerk of Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.


      **DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this __24th__ day of __January__ , 2006.


_____

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE


Copies:

All Parties of Record